UNITED STATES of America ex rel. Joseph COFFEY, Relator-Appellee,

v.

Hon. Edward M. FAY, as Warden, Green Haven Prison, Stormville, New York, Respondent-Appellant.

No. 320, Docket 29322.

United States Court of Appeals Second Circuit.

Argued Jan. 27, 1965.

Decided April 5, 1965.

Alfred I. Rosner, Martin B. Rosner, New York City, for appellee.

Joel Lewittes, Asst. Atty. Gen., State of New York, New York City (Louis J. Lefkowitz, Atty. Gen., Samuel A. Hirschowitz, First Asst. Atty. Gen., Michael H. Rauch, Deputy Asst. Atty. Gen., and Iris Steel, Deputy Asst. Atty. Gen., on the brief), for respondent-appellant.

Before WATERMAN, SMITH and ANDERSON, Circuit Judges.

WATERMAN, Circuit Judge.

Joseph Coffey was tried in the New York County Court of General Sessions, convicted by a jury of burglary in the third degree, and sentenced to six to ten years in prison. The principal items of evidence against Coffey at his trial were the proceeds of the burglary, diamonds from Cartier's jewelry store. These had been found by the police on his companion, Kingdon "Bill" DeNormand, at the time when the two men were arrested. At his trial Coffey objected in vain to the admission of this evidence, in part on the ground that the arrest and search had been conducted without warrants.

While Coffey's appeal was pending, the United States Supreme Court handed down its landmark ruling that evidence seized in violation of the Fourteenth Amendment could not be used against a defendant in a state criminal proceeding. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The New York Court of Appeals accordingly postponed determination of Coffey's appeal so that

he might move, in the court where he had been convicted, for a ruling that under Mapp the jewels were improperly admitted against him at his trial. People v. Coffey, 11 N.Y.2d 142, 227 N.Y.S.2d 412, 182 N.E.2d 92 (1962). After an extensive hearing which included the examination of numerous witnesses, the trial judge held instead that the evidence was admissible because it had been seized in the course of a search incident to an arrest upon probable cause. 36 Misc.2d 67, 232 N.Y.S.2d 545 (Sup.Ct.1962). This ruling was affirmed by the New York Court of Appeals. 12 N.Y.2d 443, 240 N.Y.S.2d 721, 191 N.E.2d 263 (1963), remittitur amended, 13 N.Y.2d 726, 241 N.Y.S.2d 856, 191 N.E.2d 910 (1963), cert. denied, 376 U.S. 916, 84 S.Ct. 671, 11 L.Ed.2d 612 (1964).

Having exhausted all available state remedies, Coffey petitioned the United States District Court for the Southern District of New York for a writ of habeas corpus, seeking release from Green Haven Prison on several federal grounds, one of which was the admission of the jewels in evidence against him at his trial. In a characterisically thorough and perceptive opinion, reported at 234 F.Supp. 543 (1964), Judge Weinfeld ruled that, on the state hearing record, the police had demonstrated probable cause to arrest Coffey and DeNormand. However, because probable cause was based in part on tips from an informer whose name the State refused to divulge, Judge Weinfeld held that Coffey had been deprived of his Fourteenth Amendment right to a fair hearing on the issue of probable cause. Judge Weinfeld therefore ordered the State to adduce other proof of probable cause, to retry Coffey without the disputed evidence, or to release him from prison.

■■ At the outset, the State contends that Coffey lacks standing to object to seizure of the jewels because they were taken neither from his person nor from property within his control. Thus the State seeks to controvert its own Court of Appeals, which ruled that Coffey did have standing to complain of the search.

This ruling, however, is not binding on a federal court adjudicating the propriety of an arrest and search under the Federal Constitution. Otherwise, less liberal state courts could foreclose one from invoking Fourteenth Amendment rights in a habeas corpus proceeding by laying down unduly narrow definitions of standing or by applying proper definitions in a parsimonious way. The point must be determined by the federal courts pursuant to federal law. Cf. Ker v. State of California, 374 U.S. 23, 33, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); Aguilar v. State of Texas, 378 U.S. 108, 110, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

■ According to the rule which governs standing to suppress evidence in a federal prosecution, the defendant must be "aggrieved by [the] unlawful search and seizure." Fed.R.Crim.P. 41(e). This rule "applies the general principle that a party will not be heard to claim a constitutional protection unless he 'belongs to the class for whose sake the constitutional protection is given.'" Jones v. United States, 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697 (1960). Because the rule is thus rooted in basic constitutional principle, the same test presumably governs standing to suppress evidence in a state prosecution. "In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed * * *." Ibid.

■■ The arrest and search of Coffey and DeNormand was triggered by information that Coffey had the proceeds of the burglary and would be attempting to dispose of them in DeNormand's company. The two men were arrested while driving in Coffey's car and were simultaneously searched on the sidewalk immediately following the arrest. At the trial both the prosecutor and the judge told the jury that in assessing Coffey's guilt, it might weigh his physical proximity to the stolen jewels at the time of his arrest.

We hold that under these circumstances the search which brought the stolen

jewels to light was "directed against" Coffey as well as DeNormand. More precisely, we hold that the State may not arrest, search, and prosecute a defendant on the theory that he is in possession of stolen property, and then object that the property was actually found on the person of a companion when the defendant moves to prevent use of the property as evidence against him. "It is not consonant with the amenities, to put it mildly, of the administration of criminal justice to sanction such squarely contradictory assertions of power by the [State]." Id. at 263–264, 80 S.Ct. at 732.

 Both parties to this proceeding, and all the courts that have passed on the issue, implicitly assume that probable cause to arrest Coffey and DeNormand is to be tested according to the information possessed by an FBI agent named Henry Gilhofer. We are willing so to test the issue, for no other view has been briefed or argued, and because we suspect that a contrary ruling on this point would not affect our result. However, for whatever value they may have in this or other proceedings, we have set forth in the margin our peripheral thoughts relative to this implicit assumption.[1]

A clear and complete chronological account of the way in which Gilhofer allegedly gathered the information leading to the arrest of Coffey and DeNormand can be found in Judge Weinfeld's opinion below. Here we shall present the same material, classified according to the origin of the information on which Gilhofer allegedly relied.

At the hearing held by the state trial judge, Gilhofer testified that some of his information was supplied by the informer whose name the State refuses to disclose. The informer told Gilhofer that Coffey and "Patsy," later identified as

---

1. About two months after the theft of the jewels, Gilhofer obtained information implicating Coffey and DeNormand in the crime. He decided that "there was no apparent federal violation" involved, so he invited the New York City authorities to join in arresting the two men. Three ·New York City detectives appeared at FBI headquarters, and Gilhofer hurriedly briefed them on the facts of the case in a sketchy fashion. The detectives agreed with Gilhofer's plans for the arrest and put themselves at his disposal. Gilhofer and numerous other FBI agents at once set out in four FBI cars, taking two of the New York City detectives with them. They located Coffey and De-Normand and trailed them for a time through the streets of the City. Eventually, in response to an order by Gilhofer, the two detectives and the other FBI agents leaped from their cars and arrested the men.

Apparently we must assume that Coffey and DeNormand were arrested on state charges. Evidence seized by federal officers in violation of the Fourth Amendment presumably may not be used in a state criminal prosecution, especially when state officers have participated in the unlawful search. Cf. Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); Byars v. United States, 273 U.S. 28, 47 S.Ct. 248, 71 L. Ed. 520 (1927). Gilhofer admitted that he lacked probable cause to arrest the men on federal charges and his appraisal seems correct, for he had no information whatever indicating that the stolen jewels had been taken across state lines. Therefore, unless Coffey and DeNormand were arrested on state charges, we would seemingly have to hold, without further discussion, that the jewels were not admissible against Coffey at his trial.

Apparently we must also assume that Coffey and DeNormand were actually arrested by the New York City detectives. FBI agents presumably have no authority under federal law to make arrests on state charges. See 18 U.S.C. § 3052. As for state law, the New York Court of Appeals seems to have treated these arrests as having been made pursuant to N.Y.Code Crim.Proc. § 177, which likewise does not authorize arrests on state charges by FBI agents. See N.Y.Code Crim.Proc. §§ 960, 154. Consequently, unless Coffey and DeNormand were arrested by state officers, we would again be led to conclude that the search which brought the jewels to light was unlawful.

Assuming, therefore, that Coffey and DeNormand were arrested by the New York City detectives on state charges, should probable cause for the arrests be tested according to the information possessed by Gilhofer or by the information known to the detectives?

Pasquale Fuca, had robbed Cartier's jewelry store; that one or the other of the two men still had the loot; that they were trying to dispose of it with the help of DeNormand; and that the three men had shown the jewels to the informer. This information was partially verified by police records, which disclosed to Gilhofer that Coffey and Fuca had criminal records and had been arrested together on several occasions; that DeNormand also had a criminal record and had been arrested many years ago while associated with Coffey's brother or uncle; and that the informer's description of the stolen jewels matched an unpublicized inventory given to the police by Cartier's.

Gilhofer also testified that some of his information was gathered in the informer's presence, although not from the informer himself, when the informer initiated a telephone call which he allowed Gilhofer to overhear. The person at the other end of the line, who answered to the name of "Bill," said that Coffey and Fuca still had the jewels despite their efforts to sell them, and that he was going to meet Coffey or Fuca that evening at 7:00 in front of the Paramount Theater in Brooklyn to make another attempt to dispose of the loot. This information was partially verified by Gilhofer and others who saw Coffey and DeNormand rendezvous in front of the theater at the appointed hour and later drive away with a third man who likewise had a criminal record.[2]

Gilhofer also testified that some of his information was obtained from sources wholly independent of the informer. The night watchman at Cartier's jewelry store described the getaway car to Gilhofer as a blue and white Oldsmobile about five years old; FBI agents familiar with the Manhattan area frequented by Coffey told Gilhofer that Coffey was known to drive his brother's car which

fitted this description; and Gilhofer observed that the car in which Coffey and DeNormand drove away from the theater the night they were arrested was a blue and white 1955 Oldsmobile hardtop. On appeal the State claims that the night watchman also gave the police a description of one of the burglars which matched Coffey's appearance; however, at the state court hearing the State implicitly disavowed any reliance on the night watchman's alleged identification of the burglars. Finally, as mentioned above, Gilhofer knew that Coffey and DeNormand had substantial criminal records.

We agree with Judge Weinfeld that this last category of facts was insufficient to establish probable cause for the arrests. The State has presented no evidence whatever that, at the time of the arrests in 1960, blue and white 1955 Oldsmobile hardtops were sufficiently rare in New York City, without more, to focus reasonable suspicion on the occupants of such a vehicle. As for the criminal records of Coffey and DeNormand, it would be an abusive rule which would automatically authorize the police to subject persons to arrests without warrants, as if they were outlaws, simply because they had been previously convicted.

These facts, however, were sufficient to establish probable cause for the arrests when taken in conjunction with the information allegedly gathered by the agent from DeNormand over the telephone in the presence of the informer. In Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), an informer who had given accurate tips in the past told the police that the defendant would be arriving in Denver by train from Chicago on the morning of September 8 or 9, wearing certain clothing, and carrying narcotics. The Supreme

---

2. In addition, the informer told Gilhofer that the person at the other end of the telephone line was "Bill" DeNormand. Even without this disclosure, however, Gilhofer was entitled to conclude that the man who had answered to the name of "Bill" was "Bill" DeNormand, when he saw "Bill" DeNormand meet Coffey at 7:00 that evening in front of the Paramount Theater in Brooklyn, precisely as "Bill" had said over the telephone that he would do.

Court held that when narcotics agents saw the defendant alight in Denver from an incoming Chicago train on the morning of September 9 attired as the informer had predicted, they had probable cause without more to arrest the defendant for concealing and transporting narcotics. Cf. United States v. Robinson, 325 F.2d 391 (2 Cir. 1963).

■ The only significant difference between Draper and our case is that Gilhofer had no cause based on personal experience to suppose that DeNormand was a reliable source of information. In our case, however, this reliability was supplied by the postulate of general experience that "a statement asserting a fact distinctly against one's interest is unlikely to be deliberately false or heedlessly incorrect." 5 Wigmore, Evidence § 1457, at pp. 262–263 (3d ed. 1940). The fact that he was helping Coffey to dispose of stolen goods was distinctly against DeNormand's "penal" interest; indeed, DeNormand was subsequently prosecuted and convicted for rendering just that help. Cf. id. at §§ 1476–77.[3]

We turn now to the crucial question of whether Coffey was deprived of his Fourteenth Amendment right to a fair hearing on the issue of probable cause because the State refused to divulge the informer's name. Petitioner, the State, and all the courts that have passed on the case, have treated the leading decision on the informer's privilege in federal prosecutions, Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), as if it were fully applicable to state prosecutions as well. We are willing to proceed on this basis, as we did earlier in our opinion when we discussed the issue of probable cause, for no other view has been briefed or argued, and because our result is the same irrespective of whether we treat Roviaro as wholly relevant to state prosecutions. However, once again we have set forth in the margin some thoughts on the subject, in the hope that they may be of use in the future.[4]

Roviaro itself furnishes a useful introduction to our problem:

"What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of vi-

**3.** We express no opinion regarding the extent to which the information that the informer himself supplied to Gilhofer might properly have helped to establish probable cause for the arrests.

**4.** We would suppose that Roviaro would not be wholly applicable to state prosecutions unless it expressed a constitutional mandate; if it merely laid down a rule of evidence, the decision would be fully pertinent to federal prosecutions alone. Furthermore, this distinction would apparently be operative even though the issues being tried in the state prosecutions were federal issues such as the legality of a search under the Fourteenth Amendment. These are the lessons we gather from Mapp v. Ohio, supra, which also concerned illegally seized evidence. There the Supreme Court expressly justified its extension of the exclusionary rule to state prosecutions on the ground that the rule was of constitutional origin rather than merely part of the federal law of evidence.

Moreover, it seems to us that Roviaro may have laid down a rule of evidence rather than a constitutional mandate.

The doctrines it enunciates are derived directly from the common law. See 8 Wigmore, Evidence § 2374 (McNaughton rev. 1961). The opinion never expressly cites the Fifth Amendment, although its mention of "fundamental requirements of fairness" may indicate that in reaching the Roviaro result, constitutional considerations were involved to some extent. In this respect Roviaro is arguably analogous to Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), another case which struck a balance between the defendant's right to disprove adverse testimony and the prosecutor's stake in protecting confidential information. Jencks has been treated, perhaps with some qualifications, as an application of common law rather than of constitutional principles. See Palermo v. United States, 360 U.S. 343, 353 n. 11, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959), citing Gordon v. United States, 344 U.S. 414, 418, 73 S.Ct. 369, 97 L.Ed. 447 (1953).

If our analysis thus far is correct, should Roviaro be treated as if it were totally applicable to state prosecutions?

olations of law to officers charged with enforcement of that law. [Citation omitted.] The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

\* \* \* \* \* \*

"A \* \* \* limitation on the applicability of the privilege arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action." 353 U.S. at 59–61, 77 S.Ct. at 627–628.

With these principles in mind, we hold that the State was not required to disclose the identity of the informer in order to make use of the information relating to Coffey's car and his criminal record. This information was derived from sources wholly independent of the informer, even though the informer may have provided clues which set the independent investigation in motion. Therefore, the informer could not have given Coffey any special help in disproving or diminishing the force of Gilhofer's testimony regarding this information. See Scher v. United States, 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151 (1938); United States v. Santiago, 327 F.2d 573 (2 Cir. 1964).

The hard question is whether the State was required to disclose the name of the informer in order to make use of the alleged telephone conversation with DeNormand which was overheard by Gilhofer. On this question Judge Weinfeld ruled:

"Evidence challenging Gilhofer on his version of the telephone call certainly was relevant and was a matter of substance to be weighed by the trier of fact. As the originator of the telephone conversation the informer was a material witness thereto; but more, he was the only person in a position to deny, contradict or explain Gilhofer's testimony on this subject. DeNormand was dead at the time of the hearing and even had he been alive his testimony could not have been compelled since he, too, was charged with the burglary. The State took full advantage of the overheard conversation as 'direct testimony' to bolster its claim of probable cause; yet, by invoking the informer's privilege, it effectively insulated this crucial testimony from rebuttal or contradiction. The State having introduced evidence in its direct case of a telephone call relevant to the principal issue, fundamental fairness required that the informer, a party to that conversation, be revealed, or else that Gilhofer's testimony be stricken." 234 F.Supp. at 549–550.

In ruling, thus Judge Weinfeld echoed the holding in Roviaro:

"This is a case where the Government's informer was the sole participant, other than the accused, in the transaction charged. The informer was the only witness in a position to amplify or contradict the testimony of government witnesses. \* \* \* We conclude that, under these circumstances, the trial court committed prejudicial error in permitting the Government to withhold the identity of its undercover employee in the face of repeated demands by the accused for his disclosure." 353 U.S. at 64–65, 77 S.Ct. at 630.

In People v. McShann, 50 Cal.2d 802, 330 P.2d 33 (1958), this holding was applied by the California Supreme Court to a telephone conversation between an in-

former and the defendant which was overheard by the police.

We believe, however, that in this area a distinction must be made between the rules to be applied at a trial to determine guilt, as in Roviaro and McShann, and at a hearing to determine probable cause, as in our case. At a trial the informer's privilege poses a policy conflict "between the encouragement of the free flow of information to law enforcement officials and the right of the defendant to make a full and fair defense on the issue of guilt." Priestly v. Superior Court, 50 Cal.2d 812, 816, 330 P.2d 39, 41 (1958). In this proceeding, we are concerned with more than just a parallel conflict "between the encouragement of the free flow of information to law enforcement officers and the policy to discourage lawless enforcement of the law." Ibid. There is also involved the public interest in using probative demonstrative evidence, the stolen jewels, to determine Coffey's innocence or guilt. See State v. Burnett, 42 N.J. 377, 387, 201 A.2d 39, 44 (1964). The State here has two weights on its side of the scale.

■ Moreover, the law already recognizes "a large difference between [guilt and probable cause], as well as between the tribunals which determine them, and therefore a like difference in the quanta and modes of proof required to establish them." Brinegar v. United States, 338 U.S. 160, 173, 69 S.Ct. 1302, 1309, 93 L.Ed. 1879 (1949). If the law did not draw this distinction, "few indeed would be the situations in which an officer, charged with protecting the public interest by enforcing the law, could take effective action toward that end." Id. at 174, 69 S.Ct. at 1310. The same exigencies of law enforcement which dictate reliance on hearsay and other extrajudicial types of evidence in the making of arrests may also compel the use of informers whose names cannot be disclosed. When Gilhofer allegedly overheard De-Normand tell the informer that an attempt to dispose of the jewels was imminent, Gilhofer's primary obligation in the time available to him was to arrange

for the arrests and not to seek to obtain the same information from sources wholly independent of the informer.

Judge Weinfeld also relied on the dictum in Roviaro:

"Most of the federal cases involving this limitation on the scope of the informer's privilege have arisen where the legality of a search without a warrant is in issue and the communications of an informer are claimed to establish probable cause. In these cases the Government has been required to disclose the identity of the informant unless there was sufficient evidence apart from his confidential communication." 353 U.S. at 61, 77 S.Ct. at 628.

This dictum was made the rule of our court in United States v. Robinson, supra, 325 F.2d at 393. Accord, United States v. Elgisser, 334 F.2d 103, 110 (2 Cir.), cert. denied, 379 U.S. 879, 881, 85 S.Ct. 148, 151, 13 L.Ed.2d 86, 87 (1964). Contra, United States v. Li Fat Tong, 152 F.2d 650, 652 (2 Cir. 1945).

■ Again, we believe that a distinction must be made between the rules applicable to cases like Robinson and Elgisser, involving communications from an informer, and cases like our own, in which the informer is a material witness to communications of other persons testified to by law enforcement officers. Typically, when the police depend upon disclosures by an informer to establish probable cause, they are also depending to a greater or lesser degree on the informer's trustworthiness. In such cases, there is particular need to scrutinize the proof of probable cause. An anonymous informer is often under strong compulsions to make false accusations, and it is all too easy for the police, without deliberately lying, to gloss these over while testifying to the informer's trustworthiness. See Jones v. United States, 105 U.S.App.D.C. 326, 266 F.2d 924, 928–929 (1959) (separate opinion).

The cases in our circuit recognize a similar distinction. In Elgisser, the opinion of the court stated that "where

the existence of probable cause depends solely upon the reliability of an informer, the Government * * * at least ought to be required to name the informer * * *. Here, however, * * * the correctness of the informer's tip had to some extent been confirmed through corroboration." 334 F.2d at 110–111. In the same case, two concurring judges noted that in Robinson the informer's identity had to be disclosed because "the arresting officers knew nothing more than what the informant had told them." Id. at 111. These statements may go further than the facts of our case require, for the State is not relying to any degree whatever, insofar as the overheard telephone conversation is concerned, on the trustworthiness of the informer.[5]

Unconstrained, therefore, by prior decisions, we look to "the particular circumstances of [this] case," as Roviaro requires, including "the possible significance of the informer's testimony," 353 U.S. at 62, 77 S.Ct. at 629, in order to determine whether the informer's identity should have been disclosed. Petitioner does not suggest that Gilhofer has misconstrued or misremembered what DeNormand said over the telephone, nor would such a suggestion be a plausible one. DeNormand's incriminating statements, as reported by Gilhofer, were quite clear and unambiguous. Moreover, Gilhofer's elaborate arrangements to arrest Coffey and DeNormand were consistent in every detail with the statements attributed by Gilhofer to DeNormand.

▮ The only remaining doubt concerning Gilhofer's testimony is the one suggested by petitioner, that Gilhofer deliberately lied about the entire telephone conversation, perhaps having acquired his information in an illicit way. However, we do not suppose that outright perjury by FBI agents is a common occurrence, and Gilhofer's veracity under oath at the state hearing was tested at least to the extent of an energetic cross-examination. Under these circumstances, we think that petitioner's prospects of demonstrating, with the help of the informer, that he was arrested without probable cause, are overbalanced by the State's dual interests in encouraging the free flow of confidential information and in using probative demonstrative evidence at the trial of a suspected criminal. Therefore, we hold that the privilege exercised by the State in withholding the identity of the informer did not deprive petitioner of his Fourteenth Amendment right to a fair hearing on the issue of probable cause.

We are grateful to assigned counsel for their vigorous representation of petitioner in this appeal.

Reversed and remanded to the district court for consideration of the other federal questions raised by petitioner.

---

5. We express no opinion on whether the State would have to disclose the name of the informer, if Gilhofer had not, himself, heard the statements DeNormand allegedly made, and if probable cause could only be established by recourse to what the informer told Gilhofer plus the corroborating circumstances.