**UNITED STATES of America**

v.

**Edward Lee TUCKER and Raymond Worrell, Defendants.**

United States District Court
S. D. New York.

Dec. 28, 1965.

Howard L. Jacobs, Asst. U. S. Atty. for Southern District of New York, for United States of America.

Theodore Krieger, New York City, for defendant Edward Lee Tucker.

Abraham Solomon, New York City, for defendant Raymond Worrell.

FRANKEL, District Judge.

Defendants have moved under Rule 41 (e) of the Federal Rules of Criminal Procedure "to suppress for the use as evidence" materials seized from them when they were arrested without warrants on October 21, 1964.[1] In the evidentiary hearing on the motion prior to trial of an indictment charging defendants with narcotics violations (21 U.S.C. §§ 173 and 174), the issue narrowed to the question whether there was probable cause for the arrest without a warrant. Ultimately, the problem before the Court

has become still narrower: it is whether the motion must be granted because the Government has refused to disclose the identities of informants whose communications led to the surveillance and arrests of the defendants. Cf. United States v. Robinson, 325 F.2d 391 (2 Cir. 1963); United States ex rel. Coffey v. Fay, 344 F.2d 625 (2 Cir. 1965).[2]

With the Government accepting the burden of going forward as well as the burden of proof, all the evidence at the hearing was given by two narcotics agents, Walter Smith and Herman H. Scott. Their testimony, which I find credible, reported the following facts:

In mid-January 1964 Agents Smith and Scott observed defendant Tucker standing on a Manhattan street next to an automobile bearing Maryland license plates. They saw him joined there by one Wiggens, a known (later convicted)

1. The motion was originally made on behalf of defendant Tucker alone, with counsel for defendant Worrell present at the hearing as an interested observer. During the course of the hearing, with the Government's consent, defendant Worrell joined in the motion.

2. It seems useful to record here the somewhat wavering route by which the Court reached the issue. Fairly early in the course of cross-examining the first of the two narcotics agents who testified, defense counsel asked for the names of four informants whom the agent had described as suppliers of incriminating reports. An objection to such disclosure was sustained at that time. After the Government's second, and last, witness had testified on direct, the Court revived and reconsidered the problem. Without the benefit of later reflection on the record as a whole, it seemed questionable then whether there was "sufficient evidence apart from the [informers'] * * * information * * * to justify arrest" of the defendants. United States v. Robinson, supra, 325 F.2d at 393. Since the parties appeared to agree that the Government was required to establish probable cause through evidence wholly independent of the reports from undisclosed informers, I invited the Government to consider revealing the identity of at least one or two of the informants. The Assistant United States Attorney argued that an "invitation"

posed excessively delicate issues of legal etiquette for the Government. He urged, in effect, that the evidence be considered, first, with the informants undisclosed, and that the question of disclosure be faced only after a finding, if one were made, that there was insufficient independent evidence of probable cause. Defense counsel, on the other hand, argued convincingly that the Government ought not to have the proverbial two bites. Resolving the tension, I ordered the Government to disclose the names of two of the informants. The Government, after a weekend recess, refused.

Since I have now concluded, nevertheless, that the motion to suppress should be denied, it turns out that the Government was justified when it deemed disclosure unwarranted. This means, superficially at least, that "defiance" of the Court's order was justified. But such a posture is at best unlovely. I conclude from all this that the Government, knowing in advance how it will seek to sustain probable cause, ought to make its own responsible judgment, without an "order," whether the informants' identity should be given when it is demanded. This places upon the prosecution, where it belongs, the choice between disclosing and running "the risk of having the arrest held invalid." United States v. Robinson, supra, 325 F.2d at 394; see also Priestly v. Superior Court, 50 Cal.2d 812, 818, 330 P. 2d 39, 43 (1958).

seller of narcotics. As they watched, Tucker handed Wiggens a sum of money. Later that evening Agent Scott made a purchase of heroin from Wiggens, who was the immediate subject of investigation at the time.

Shortly thereafter the agents checked with the Baltimore office of the Federal Bureau of Narcotics and learned that the automobile they had seen was registered in Tucker's name. Their Baltimore colleagues also reported that Tucker was under active investigation for suspected trafficking in narcotics between Baltimore and New York City.

In June of 1964 the agents were told by their New Orleans office that named New Orleans police officers had reported the transportation by Tucker of a load of heroin from Baltimore to New Orleans. The New Orleans report also told of an arrest and search of Tucker in May of 1964 resulting in the discovery of a small amount of marihuana on his person.

Then, in September and October of 1964, the agents were told by some four informants—all described by the agents as sources of previous information that had been checked and found correct—that Tucker made it a practice to come to New York City to buy narcotics for disposition in Baltimore, the District of Columbia, and New Orleans. The informants also said, according to the agents, that Tucker commonly stayed during these New York trips at a drive-in hotel on Macombs Place in Manhattan, registering as Edward Perkins. Finally, the informants were said to have reported that Tucker drove on this business in one of three automobiles, a 1964 green Cadillac, a 1964 white Thunderbird, or a 1963 blue Cadillac.

On the evening of October 20, 1964, Agent Scott and his colleague, Dennis Raugh, were told by an informant that Tucker was in New York City, driving the 1964 green Cadillac in the company of a man known as "Bippity Bop," and planning to purchase a large quantity of heroin. In response to a telephone call from Agent Scott, Agent Smith checked the Narcotics Bureau's files and learned

that "Bippity Bop" was a nickname of defendant Raymond Worrell.

At about 9:00 p. m. on that evening Agents Scott, Smith, and Raugh drove to a point opposite the Macombs Place motel and parked their automobile there. Shortly thereafter the two defendants arrived in the previously described green Cadillac and drove into the motel parking lot. Tucker alighted from the car and Worrell slid over to take his place in the driver's seat. The two talked through the open door on the driver's side, and Tucker handed Worrell a sum of paper money. Tucker then started into the motel as Worrell began to back the car out of the lot. On an apparent further thought, Tucker came back out of the motel entrance and recalled Worrell, who drove back into the motel parking lot.

By this time Agent Scott had crossed the street and was standing under the shelter at the motel's entrance, ostensibly to avoid the rain which was falling at the time. In this position he heard Tucker, who was standing close by, tell Worrell to seek "a sample" for him and arrange "a meet" or an appointment "as soon as possible." With that Worrell drove off and Tucker re-entered the motel. Agent Smith, still watching from across the street, saw Tucker emerge on an outside veranda and enter Room 211. Agent Scott at this point called the motel, asked for Mr. Perkins, was told the line was busy, and was referred to room number 211 when he said he would call back later.

About a half hour later Worrell returned to the motel and entered Room 211. In about fifteen minutes Tucker emerged, entered the Cadillac, and drove to a bowling alley, followed by the agents. Agent Scott followed Tucker into the bowling alley and watched the latter walk about for a while and then take up a position from which he stood watching some ladies bowling. Scott stationed himself nearby. After some twenty minutes Tucker was joined by one Thomas Coswell. As Coswell arrived Agent Scott heard Tucker say to him, with some heat, approximately the following: "You know not to keep me waiting on business like

this." Thereupon, Tucker and Coswell left the bowling alley and drove to the motel, where they joined Worrell in Room 211.

Some fifteen to twenty minutes later, Worrell came downstairs and sat in the car. He was joined there by Coswell after another fifteen minutes or so, whereupon the two drove away, trailed by the agents. They stopped first at a bar and grill, where Worrell waited while Coswell entered. Coswell returned in about five minutes, and the two proceeded to a restaurant about two blocks away, where Coswell made another visit of a minute or so while Worrell again waited. They drove next to a building at 69 East 123rd Street; Coswell again entered and emerged after about five minutes to rejoin the waiting Worrell in the automobile. At this point Worrell left Coswell and drove back to the motel.

As Worrell came to a stop in the motel parking lot, the agents placed him under arrest and proceeded to search the automobile. They found and seized 25 glassine envelopes containing white powder, a white envelope containing white powder, and a bag containing two boxes of 1,000 caps each. They then proceeded to Room 211 and arrested defendant Tucker.

Upon the evidence thus developed, this is obviously not a case in which the showing of probable cause for the arrest rests entirely, or almost entirely, upon information from secret informants. Thus, we are at a far remove from the situation in United States v. Robinson, 325 F.2d 391 (2 Cir. 1963), where the Government was required to disclose the informant in order to validate the arrest.

On the other hand, this is not a perfectly clear case for holding that the "independent evidence," viewed in strict isolation from what the informants are said to have reported, was sufficient to make out probable cause. To be sure, this independent evidence would itself go far toward justifying reasonably prudent law enforcement officers in believing, after what they had seen and heard, that the time had come to move in and

make an arrest for narcotics violations then in progress. The fact remains that this evidence was certainly not offered "independently." The critical surveillance of October 20–21, 1964, was in fact triggered by informants' tips. The conduct of the defendants on that night—including the overheard statements, the passage of money, the bowling-alley rendezvous for purposes other than bowling, and the swift visits to a bar, a restaurant and a residence—might all be considered as only generally suspicious, or, indeed, consistent with lawful pursuits of some kind. And it would remain at least arguable, as the Government evidently foresaw when it prepared for the hearing, that the case for probable cause was not made even by adding (1) the earlier, somewhat remote (January 1964) observation of defendant Tucker dealing with a narcotics seller and (2) information from other Narcotics Bureau offices indicating that defendants were linked to the unlawful traffic.

It is fair, at a minimum, to say that the reported communications from informants serve to illuminate and to make entirely intelligible the other evidence upon which the Government relies. In more standard terms, the two categories of evidence present a pattern of mutual corroboration which, if it may properly be considered without requiring the informants' identities, renders an otherwise debatable showing utterly convincing. In the circumstances of this case, it would be at least artificial to consider the so-called independent evidence as if the Government had never adduced evidence about informants.

It has seemed proper and realistic, in short, to appraise this record as the parties (primarily the Government) made it, and to decide in this light whether the motion must be granted because the identities of the informants have been withheld. For the reasons that follow, I conclude, notwithstanding the nondisclosure, that the motion ought properly to be denied.

■ The courts ruling on such motions in recent years have, naturally,

sought to follow and apply the teaching of Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). There, although the precise problem for decision concerned refusal to identify an informer during the trial of the indictment, the Court noted in its opinion the apparently governing rule on the hearing of motions to suppress. It said (p. 61, 77 S.Ct. p. 628):

"* * * Most of the federal cases involving this limitation on the scope of the informer's privilege have arisen where the legality of a search without a warrant is in issue and the communications of an informer are claimed to establish probable cause. In these cases the Government has been required to disclose the identity of the informant unless there was sufficient evidence apart from his confidential communication."

Pondering the question whether in a particular case "the communications of an informer are claimed to establish probable cause", a number of opinions since Roviaro have said disclosure is required "where the existence of probable cause depends *solely* upon the reliability of an informer * * *." United States v. Elgisser, 334 F.2d 103, 110 (2 Cir.), cert. denied, Gladstein v. U. S., 379 U.S. 879, 881, 85 S.Ct. 148, 13 L.Ed. 86 (1964) (emphasis added); see also United States ex rel. Coffey v. Fay, 344 F.2d 625, 633–634 (2 Cir. 1965); People v. Malinsky, 15 N.Y.2d 86, 93–94, 255 N.Y.S.2d 850, 858–859, 204 N.E.2d 188 (1965).

■ At other places, including some of the same opinions, considering whether "there was sufficient evidence apart from [the informer's] confidential communication", there are statements that disclosure is compulsory whenever the informants' communications are "essential to the establishment of probable cause * * *." United States v. Elgis-

ser, supra, 334 F.2d at 110; see also United States v. Santiago, 327 F.2d 573, 575 (2 Cir. 1964); United States v. Rosario, 327 F.2d 561, 564 (2 Cir. 1964); United States v. Robinson, supra, 325 F.2d at 393–394. The word "essential" could be read—though it need not be, and, I conclude, should not be—to mean "necessary"[3] to any degree, thus suggesting that informants must be identified unless the independent evidence alone, without any reference to their statements, shows probable cause. On the other hand, "essential" frequently connotes "important in the highest degree," and this, in my view, is the suitable meaning for our context.[4] On this reading, disclosure would be demanded whenever the reports of what informants said comprised the essence or core or main bulk of the case for probable cause.

Again, it has been said that the Government must disclose or accept suppression unless the informer's leads are shown to have been "confirmed through corroboration." United States v. Elgisser, supra, 334 F.2d at 111; see also Lane v. United States, 321 F.2d 573, 575 (5 Cir. 1963), cert. denied, 377 U.S. 936, 84 S.Ct. 1340, 12 L.Ed.2d 299 (1964); Buford v. United States, 308 F.2d 804, 805 (5 Cir. 1962); People v. Malinsky, supra, 15 N.Y.2d at 94–95, 255 N.Y.S.2d 850, 204 N.E.2d 188.

■ The idea of "corroboration" would seem in the end to be one key to sound resolution of motions to suppress. Assessing the net results of Roviaro and the decisions following it, there is no warrant for concluding that identities of informers must be divulged in any case where hearsay evidence of what the informers said plays *any part* in the demonstration of probable cause. If this were the law, the perplexities the courts have faced would have been imaginary all along. The correct course would have been simply to exclude or strike such evidence about informers unless identities

3. Webster's New International Dictionary of the English Language (2d ed., 1950), p. 874.

4. Ibid.

were routinely and automatically revealed. It might have followed, similarly, that magistrates issuing warrants would be required as of course to have informants identified in supporting affidavits. Cf. Rugendorf v. United States, 376 U.S. 528, 533, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964); Jones v. United States, 362 U.S. 257, 271–272, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

■ But the learning indicates no such routine simplicities. Roviaro itself cautions that this is one of the many areas where competing interests must be fairly balanced in the varying circumstances of individual cases (353 U.S. at 62, 77 S.Ct. at 628–629):

"We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."

■ Because the task in each case is to weigh the defendant's claim, including the conceivable benefits to him of knowing the informer, against "the public interest in protecting the flow of information", it can hardly be that disclosure is to follow mechanically whenever an informer's report plays some role in the proof of probable cause. If this automatic result were proper, there would never be anything to weigh in these cases. If informers' reports are not used at all to show probable cause, there is no occasion for a defendant to demand the informers' identities. The problem, with the need to strike a balance, only arises in these suppression cases when some use is made of what the informers allegedly said.

Reasoning from the foregoing premises—and having in mind that the Government's burden here is to prove probable cause for a lawful arrest rather than prima facie evidence of guilt—I conclude that disclosure was fairly refused in this case.

■ This, as I have noted earlier, is plainly not a case where the agents knew little or nothing except what they had heard from informants. Cf. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); United States v. Robinson, supra. Both before and after the informants' reports, the agents' direct observations and information from other Narcotics Bureau offices went most if not all of the way toward justifying the arrests when they were made.

■■ The hearing record is persuasive that the basic safeguards of the Fourth Amendment have been fairly observed in this instance. Among those safeguards is the requirement that law enforcement officers, when they arrest people without warrants, will do so only upon "facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information * * * sufficient to warrant a prudent man in believing that" the person to be arrested has committed or is committing an offense. Beck v. State of Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); see also Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); Draper v. United States, 358 U.S. 307, 321 n. 7, 79 S.Ct. 329 (1959) (dissenting opinion). Here, careful investigation and surveillance, beyond the reports from informers, gave such assurance. The reported accounts by informants were corroborated in meaningful circumstantial detail by the detective efforts of the agents. Although it is consistent with the remote possibility that both agents supplied only perjury on the witness stand, one such detail is the realized prediction that defendant Tucker would check in at the Macombs Place motel.

Similar evidence is Agent Scott's testimony that he asked for the reported alias "Perkins" and was given the number of the room Tucker had been observed to enter. In addition, the whole course of conduct the agents saw and heard, while it could have seemed innocent if the agents had known nothing in advance, served powerfully to show that the predictions of narcotics business were coming true. Some weight must be given after all to the informed judgment of experienced agents, dealing with one of the more effectively furtive crimes. See United States v. Santiago, supra, 327 F.2d at 574–575.

Defendants rest ultimately on the speculation that both agents lied under oath when they said (1) they had received the information they recounted and (2) their informants had previously given correct leads. This possibility remained almost entirely incredible after the agents had been cross-examined. While it is still a possibility, we are entitled to believe generally that such "outright perjury * * * is [not] a common occurrence * * *." United States ex rel. Coffey v. Fay, 344 F.2d 625, 634 (2 Cir. 1965). The likelihood that defendants would have used the informants had· the names been disclosed,[5] and that the strong showing of probable cause could then have been dissipated, is thin almost to the point of nonexistence. In short, while the situation differs in its details, the conclusion of the case last cited seems appropriate: "that [defendants'] prospects of demonstrating, with the help of the informer[s], that [they were] arrested without probable cause, are overbalanced by the [Government's] dual interests in encouraging the free flow of confidential information and in using probative demonstrative evidence at the trial * * *." United States ex rel. Coffey v. Fay, supra, at 634.

Accordingly, the motion to suppress is denied.

So ordered.

---

5. Cf. Note, Informer's Word as the Basis for Probable Cause in the Federal Courts, 53 Calif. L.Rev. 840, 855–856 (1965).