**UNITED STATES of America,**
**Appellee,**

v.

**Felix LOPEZ, Defendant-Appellant.**
**No. 543, Docket 29193.**

United States Court of Appeals
Second Circuit.

Argued June 22, 1965.

Decided Jan. 19, 1966.

Robert L. Latchford, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., for the Southern Dist. of New York, New York City, on the brief, Richard A. Givens, Asst. U. S. Atty., of counsel), for appellee.

Arthur L. Liman, New York City (Anthony F. Marra, New York City, on the brief, Roger Goldburg, New York City, of counsel), for appellant.

Before MOORE and FRIENDLY, Circuit Judges, and WEINFELD, District Judge.

MOORE, Circuit Judge:

Felix Lopez was indicted and convicted after a non-jury trial on two counts for selling heroin in violation of 21 U.S.C.A. §§ 173–174 and on one conspiracy count. Concurrent sentences on all three counts were imposed. On appeal he argues that he was not proven to have had "possession" of the narcotics within the meaning of the statute and that, consequently, the provision permitting an inference of knowledge of illegal importation to be drawn from possession was inoperative.

Taken most favorably to the Government, the evidence established with respect to the first sale count that on April 8, 1963, Federal narcotics undercover agent, Angel Gonzalez, was introduced by an informant to Lopez and one Gladys Arzuaga, referred to by Lopez as his wife. The meeting took place at Lopez' apartment. The agent told Lopez that he was interested in buying heroin. The agent returned that night and again met Lopez and Gladys. Lopez asked if the agent were still interested in buying "some stuff." The agent said he was interested in one-half ounce. Lopez said he could not supply that amount in bulk but could, for $175, give him ten "spoons" of heroin which would be equivalent. The agent agreed, and Lopez asked Gladys (who had been working in the kitchen) if they had ten spoons for the agent. She said she did and Lopez told her to give ten spoons to the agent. She withdrew them from her bosom and

handed them to the agent, accepting $175 from him. The agent then left.

An essentially similar transaction took place on April 25th. As the agent was leaving the apartment on this occasion, Lopez said that if an ounce of heroin were desired in the future, he should know in advance so as to have it available in bulk rather than in small packages.

The starting place for a consideration of whether Lopez had "possession" of the heroin sufficient for the purposes of the statute is the decision in United States v. Jones, 308 F.2d 26, 30 (2d Cir. 1962). There it was stated that "physical custody" was not always required and that it would be sufficient if the defendant had "power to control the disposition of drugs." This "constructive possession" would exist if the defendant had "a working relationship or a sufficient association with those having physical custody of the drugs so as to enable him to assure their production, without difficulty, to a customer as a matter of course * * *" Constructive possession would not exist if the defendant were a mere "casual facilitator" who only knows of a source of drugs "but who lacks the working relationship with that principal that enables an assurance of delivery * * *" Id. at 30.

█ Applying that test, we find that Lopez was far more than a casual facilitator and that his constructive possession was adequately established. See, e. g., Lucero v. United States, 311 F.2d 457, 459 (10th Cir. 1962), cert. denied, 372 U.S. 936, 83 S.Ct. 883, 9 L.Ed.2d 767 (1963); United States v. Ramis, 315 F.2d 437, 438–439 (2d Cir. 1963); United States v. Douglas, 319 F.2d 526, 527 (2d Cir. 1963); United States v. Carter, 320 F.2d 1, 2 (2d Cir. 1963); Mack v. United States, 326 F.2d 481, 486 (8th Cir. 1964); Quiles v. United States, 344 F.2d 490, 493 (9th Cir. 1965); United States v. Rivera, 346 F.2d 942, 943 (2d Cir. 1965). But cf. Lucero v. United States, supra; Brumbelow v. United States, 323 F.2d 703, 705 (10th Cir. 1963); Orozco-Vasquez v. United States, 344 F.2d 827, 829 (9th Cir. 1965). Much is made by Lopez of the agent's repeated use of the word "instruct" in testifying as to what Lopez said to Gladys. Whether that is simply the agent's descriptive word or not, it is clear from the whole record and context that Lopez "told" or otherwise communicated to Gladys in a successful way the idea that she should transfer a prescribed amount of narcotics to the person with whom he had been dealing. Gladys may have had the physical custody of the narcotics (she, not Lopez, was a user) but she was obviously willing to transfer them to a person with whom only her "husband" had been dealing, on terms arranged by him. It is said that Lopez received "not a nickel" for his efforts. But in both instances, the agent left right after making payment.

Lopez places great emphasis upon the fact that his "wife," Gladys, not he, was the recipient of the purchase price. At least *pro tem.*, this pseudo-marital relationship constituted their family unit. They obviously worked as a team and not as independent contractors; the "husband" making the sale; the "wife" making delivery and receiving the money. There is no factual similarity to the situation in United States v. Jones, 308 F.2d 26 (2d Cir. 1962), for example, where the majority held that since Jones' part in the transaction was only to introduce a willing buyer (the agent) to a willing seller ("Big Charlie"), Jones did not have the requisite domination and control to justify a finding of constructive possession.

█ Lopez claims secondly that "the Government's failure to fulfill its duty to produce the grand jury minutes, requiring appellant [Lopez] either to waive his right to production or to forego a prompt trial, violates the rules of fair play and warrants a reversal and new trial." We disagree with this conclusion and with the assumptions on which it is based.

Before trial, Lopez' counsel was informed that the grand jury minutes had not been transcribed and that the reporter was unavailable. Yet he stipulated that the Government could proceed to trial without the minutes. On trial, however, he requested the minutes just after the agent testified. He withdrew the request when it was announced that the reporter was on vacation and the notes could not be read by anyone else.

In United States v. Giampa, 290 F.2d 83, 85 (2d Cir. 1961), it was indicated that, in order to protect a defendant's rights with respect to impeaching a Government witness, the Government should not normally call a witness who also testified before the grand jury unless or until a transcript of his grand jury testimony was available. Conversely, if for one reason or another a transcript were not yet available, this would seem to furnish a sufficient reason to postpone the trial. See United States v. Kaufman, 311 F.2d 695, 698 (2d Cir. 1963). A delay of a few weeks or months for such a legitimate reason would not constitute the kind of oppressive, deliberate and purposive delay that results in denial of the right to a speedy trial. See United States v. Torres, 343 F.2d 750, 751 (2d Cir. 1965). Thus, even if he had requested, see United States v. Lustman, 258 F.2d 475, 478 (2d Cir.), cert. denied, 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed.2d 109 (1958), rather than acquiesced in, an early trial, Lopez would be in error in assuming that his right to a speedy trial would have been denied if the trial had been delayed.

Moreover, Lopez agreed before trial to go to trial at that time with knowledge that the transcript was not yet available. If this did not completely end the matter, the abandonment of the renewed request at trial surely would have. See United States v. Kirby, 273 F.2d 956, 957 (2d Cir. 1960).

Lastly appellant makes the contention that the use of appellant's statement taken by an Assistant United States Attorney almost immediately after arrest and before appellant had an opportunity to secure, or request assignment of, counsel, violated his constitutional rights. A review of the entire transcript of this one-day trial reveals that Lopez took the stand in his own defense. On direct examination, he testified in substance that he had lived for the past 20 years with Josephine Mendez (co-defendant; action severed because she was then a fugitive); that he saw the government agent, Gonzalez, once on the stairs of the building in which he (Lopez) lived; that Gonzalez had asked him to get some "tecata" (narcotics) for him (Gonzalez); that Lopez denied knowing anything about "this business"; that he (Lopez) never saw him (Gonzalez) in Lopez' apartment; that Lopez never directed Mendez to hand over packages containing a white substance to Gonzalez; and that Lopez had a previous conviction for the possession of marihuana. On cross-examination, Lopez again denied that he had ever seen Gonzalez in his (Lopez') apartment and that he had asked Mendez if she had ten spoons (of heroin). The prosecutor then sought to impeach Lopez by referring to a question and answer statement taken on the morning of the day of Lopez' arrest (May 9, 1964). There is nothing in the statement which can be characterized as an admission of guilt by Lopez.

"Q. Do you recall being asked this question:

'Q. People did come to your apartment in April of this year and you sold narcotics to them along with Gladys; is that right?'

"A. No.

*"By the Court:*

"Q. Were you asked that question by Mr. Quinlan? A. Yes, I was asked.

"The Court: What was his answer on the statement?

"Mr. Latchford: The answer to this question was: 'Two men did come to my house and one of them

asked me if I had 10 spoons and I then asked Josephine if she had them and she said yes. Upon her saying yes, I retired to the kitchen and began to watch TV and she hollered from the kitchen that one of the men wanted to buy a pack and I said, "Well, that's your business." I don't know whether it was to be a sale or just a gift. I remained watching TV. I don't know what business they did.'

"Q. Did you give that answer to Mr. Quinlan? A. No, that's not the answer I gave them because I can tell you exactly the answer I gave them.

"Q. What was the answer you gave them? A. The answer that I gave was this:

'I was in bed. It was about 1.30. I had been out to a party at my sister's house. I told them that my wife had yelled out to me about a package of something and I said to her, "That's none of my business. Do whatever you want." ' "

Appellant argues that before the statement, "As far as the record goes, the appellant was not apprised of his right to an attorney, nor offered the services of a court-appointed attorney (A–52). Indeed, it does not appear that he was advised of his Fifth Amendment rights." This court to assure itself of an absolutely fair trial for the accused and to a fair appraisal of the conduct of prosecution and defense counsel alike is under a duty to make its own inquiry into the record. The transcript discloses that the prosecutor had the question and answer statement in court and was reading from it when the trial judge interrupted, saying, "Let us not go all through that. Get to the question you want to use to impeach." Then followed the questions and answers set forth above. Possibly appellant's appellate counsel did not see the statement which at the outset shows that the prosecutor said to Lopez:

"My name is Quinlan, Assistant United States Attorney, Federal prosecutor.

"I am going to ask you some questions. You don't have to answer the questions if you don't want to. Anything you do say can be used against you and you have a right to a lawyer. Do you understand that?

"Yes."

Lopez also said that the arresting agents had treated him nicely, had not threatened him or promised him anything, that he knew that he did not have to say anything but if he did that it could be used against him. He then told a story inculpatory as to Mendez but obviously believed by him to be exculpatory as to any sale or participation therein by him.

No objection was made to the answer read at the trial court's direction. Nor can any sound argument be premised upon this answer as an admission by Lopez of guilt. The conclusions reached by this court in United States v. Cone, 354 F.2d 119, November 1965; United States v. Robinson, 354 F.2d 109, November 1965; United States v. Indiviglio, 352 F.2d 276, October 1965; and United States v. Del Llano, 354 F.2d 844, December 1965, support the result reached here as to the admissibility of the statement, as to the lack of counsel at the time the statement was given, and as to the failure to object.

Judgment of conviction affirmed.