**UNITED STATES of America, Appellee,**

v.

**Edward Lee TUCKER, Appellant.**

**No. 359, Docket 30505.**

United States Court of Appeals Second Circuit.

Argued March 9, 1967.

Decided June 28, 1967.

David A. Luttinger, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, Daniel R. Murdock and Michael W. Mitchell, Asst. U. S. Attys., New York City, on the brief), for appellee.

Theodore Krieger, New York City, for appellant.

Before LUMBARD, Chief Judge, and WATERMAN and SMITH, Circuit Judges.

LUMBARD, Chief Judge.

■ Edward Lee Tucker appeals from a judgment of conviction, after a jury trial in the Southern District, for receiving and possessing, and conspiring to receive and possess heroin, in violation of 21 U.S.C. §§ 173, 174. He was sentenced to 7½ years on each count to be served concurrently. On appeal, he claims that the government failed to establish probable cause for his arrest without a warrant,[1] and that evidence

1. No argument is made that the agents ought to have obtained a warrant prior to the search and arrest. The Narcotics Control Act of 1956, 70 Stat. 570 (1956), 26 U.S.C. § 7607, specifically gives narcotics agents the power to arrest without warrant "where they have reasonable grounds to believe that the person to be arrested has committed or is committing a violation of the narcotics laws." United States v. Santiago, 327 F.2d 573, 575 (2 Cir. 1964); see Wong Sun v. United States, 371 U.S. 471, 478, n. 6,

83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Here, it would have been highly impracticable to pause to obtain a warrant. The agents were required to move quickly to arrest both parties and obtain the narcotics which could have been easily removed or secreted. Moreover, even if a warrant could practically have been obtained, the search would not have been improper. E. g., United States v. Rabinowitz, 339 U. S. 56, 65–66, 70 S.Ct. 430, 94 L.Ed. 653 (1950); United States v. McMillan, 368 F.2d 810, 812 (2 Cir. 1966), cert. denied,

obtained in a search incident to his arrest ought therefore to have been suppressed at the pretrial hearing. Judge Frankel, following the government's refusal to comply with an order to disclose the identity of certain informers, nevertheless found that there was probable cause for arrest. D.C., 248 F.Supp. 911 (1965). Appellant further contends that the evidence adduced at trial was insufficient to warrant submission of the case to the jury. We find that the evidence produced both on the motion to suppress and at trial was sufficient to establish probable cause for arrest and to justify a verdict of guilty, and we affirm appellant's conviction.

The arrest was made on the following information. During January 1964, federal narcotics agents Herman Scott and Walter Smith were conducting a surveillance in New York City of one David Wiggens, a suspected seller of narcotics.[2] On the evening of January 16, the agents saw Wiggens approach appellant, the two men converse, and appellant hand Wiggens some currency. That evening, appellant was observed driving a blue 1963 Cadillac convertible with Maryland license plates, entering the apartment building in which Wiggens lived, and thereafter leaving with him. Twenty minutes later, Wiggens sold Agent Scott some narcotics. Upon inquiring at the Baltimore office of the Bureau of Narcotics, Scott learned that the Cadillac convertible was registered to appellant, who was under investigation in Baltimore by both state and federal authorities for transporting narcotics between New York and Baltimore.

During July 1964, Smith received a second report, this one from the Bureau's New Orleans office, to the effect that a warrant to search appellant's automobile was issued while he was in New Orleans, and although the search disclosed nothing, he was subsequently found with a small quantity of marijuana on his person. Thereafter, in September and October 1964, Scott was given information about appellant's pattern of operations by four informants, all of whom, according to Agent Smith, had previously given information that had proved reliable.[3] According to the informants, appellant customarily drove to New York City with an associate in a new Cadillac convertible or Thunderbird with Maryland license plates, to purchase drugs. He would usually stay in a drive-in motel at 75 Macombs Place in Manhattan, registering under the name of Edward Perkins or Edward Johnson. Appellant would then canvass a number of sources of narcotics and purchase a supply of drugs to be adulterated and packaged in Baltimore for sale there, in Washington, D. C., and in New Orleans.

On the evening of October 20, agents Scott and Dennis Raugh learned from an informer that appellant, accompanied by one "Bippety Bop," had arrived in town to purchase a large quantity of heroin and that the two were traveling in appellant's green 1964 Cadillac convertible. Upon checking with the Bureau of Narcotics files, the agents learned that "Bippety Bop" was an alias used by one Raymond Worrell, a suspected Baltimore narcotics trafficker. At about 9:00 P.M. agents Smith, Scott and Raugh drove to a point opposite the Macombs Place motel. Within a short time they spotted appellant driving into the motel parking lot. Appellant got out, Worrell moved into the driver's seat and appellant handed him some money. As Worrell started to leave appellant recalled him and, according to Agent Scott, who by now had crossed the

---

386 U.S. 909, 87 S.Ct. 856, 17 L.Ed.2d 783 (Feb. 13, 1967): United States v. Francolino, 367 F.2d 1013, 1017–1018 (2 Cir. 1966), cert. denied, 386 U.S. 960, 87 S.Ct. 1020, 18 L.Ed.2d 110 (Mar. 13, 1967).

2. Judge Frankel's opinion below reveals that Wiggens was later convicted. 248 F.Supp. 912.

3. On cross-examination, Agent Smith stated that, in his view, approximately 50% of the information received from the four informers on prior occasions had been checked out, and all had proven correct.

street and was standing nearby in the shelter of the motel entrance, appellant said words to the effect of "See if you can get a sample and make a meet for me as soon as possible." Agent Smith, continuing the surveillance from across the street, saw Tucker enter Room 211 on the upstairs balcony. Agent Scott then called the motel and learned that "Edward Perkins" had registered in Room 211. Within half an hour Worrell returned with the car, parked it in the motel lot, and went into Room 211. Fifteen minutes later, appellant came out alone and drove off to a nearby bowling alley on 146th Street, where, following a twenty minute wait, he met with one Thomas J. Carswell (Coswell?). Agent Scott, who had followed appellant into the bowling alley, overheard him admonish Carswell for keeping him waiting "on business like this." Tucker and Carswell then left the alley together, and drove to the motel where they joined Worrell in Room 211.

Within twenty minutes Worrell came downstairs and sat in the car, followed a few minutes later by Carswell, and the two drove off in appellant's green Cadillac, trailed by the agents. They drove first to a bar and grill, then to a restaurant, and lastly to a building at 69 East 123rd Street. Each time Worrell waited in the car while Carswell ran inside. Carswell and Worrell then parted company, and Worrell returned to the motel parking lot alone, where the agents moved in and arrested him. A search of appellant's automobile disclosed 12.38 grams of heroin, mannite, gelatin capsules, glassine envelopes, an eyedropper and a hypodermic needle. The agents then went to Room 211 where they arrested appellant.

Appellant does not claim that all of the above information would not constitute probable cause. Rather, he contends that the agents were not entitled to rely on the informers' reports to aid in showing probable cause without disclosing their identities and that, without the information furnished by the informers, probable cause was not established.

■ Even if we were required to decide the issue as it has been framed by the appellant, there is much to suggest that probable cause for arrest had been established solely on the basis of the agents' personal observations and the reports received from other Bureau of Narcotics offices in Baltimore and New Orleans. Compare, e. g., Scher v. United States, 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151 (1938); United States v. Santiago, 327 F.2d 573 (2 Cir. 1964). Nine months prior to arrest, agents Smith and Scott had observed a transaction between appellant and David Wiggens, who was then an active seller. During the three and one-half hour surveillance prior to arrest, agents Smith, Scott and Raugh observed the passing of money by the appellant to "Bippety Bop" Worrell and they overheard conversation about a sample and making a "meet," appellant's meeting and conversation with Carswell, and the midnight travels of Worrell and Carswell, all of which, coupled with the use of an assumed name at the motel, gave good cause to believe that a narcotics transaction was under way. For purposes of appeal, however, we think it is enough that we agree with Judge Frankel that the agents' direct observations and the information received from official files "went most if not all of the way toward justifying the arrests". 248 F.Supp. at 916.

■ The issue before us then is whether, in light of the decisions of the Supreme Court and this court and of the policies which underlie the "informer's privilege," *some* use can be made of the information received from the four informants in order to establish probable cause, without disclosing their identities and without setting forth "underlying circumstances" to support the reliability of the informers or the basis of their information to the extent suggested by Aguilar v. State of Texas, 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1963), see, e. g., United States ex rel. Rogers v. Warden, 381 F.2d 209 (2 Cir., June 15, 1967), where a portion of the information received has been corrob-

orated by the agents' own surveillance. It is our view that since the information received from undisclosed sources was not "the essence or core or main bulk of the case for probable cause", 248 F.Supp. at 915, and since the informants' description of the appellant's *modus operandi* was corroborated in sufficient detail to lend an aura of credence to the remainder of the information and to entitle it to consideration apart from a showing of reliability as to the individual informers, it was unnecessary to require disclosure of their identities. Cf. Jones v. United States, 362 U.S. 257, 269, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); United States v. Elgisser, 334 F.2d 103 (2 Cir.), cert. denied sub nom. Gladstein v. United States, 379 U.S. 879, 85 S.Ct. 148, 13 L.Ed.2d 86 (1964); Buford v. United States, 308 F.2d 804 (5 Cir. 1962); United States v. Irby, 304 F.2d 280 (4 Cir.), cert. denied, 371 U.S. 830, 83 S.Ct. 39, 9 L.Ed. 2d 67 (1962); United States v. Woodson, 303 F.2d 49 (6 Cir. 1962); United States v. Williams, 219 F.Supp. 666 (S.D.N.Y. 1963), aff'd, 336 F.2d 183 (2 Cir.), cert. denied, 379 U.S. 857, 85 S.Ct. 112, 13 L.Ed.2d 60 (1964).

■■ There is no absolute constitutional right to disclosure of the identity of an informer at every hearing on a motion to suppress.[4] See, e. g., McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L. Ed.2d 62 (1967). The Supreme Court in the exercise of its power to formulate evidentiary rules for federal criminal cases, has continued to recognize the importance of the "informer's privilege." See, e. g., United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1964), cf. Lewis v. United States, 385 U.S. 206, 210, 87 S.Ct. 424, 17 L. Ed.2d 312 (1966).

■ Appellant's position on appeal is that the Supreme Court dictum in Roviaro v. United States, 353 U.S. 53, 61, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), to the effect that disclosure had been held necessary in probable cause cases "unless there was sufficient evidence apart from [the informer's] confidential communication" was adopted as the law of this circuit by United States v. Robinson, 325 F.2d 391, 393 (2 Cir. 1963), see United States ex rel. Coffey v. Fay, 344 F.2d 625, 633 (2 Cir. 1965), and the word *apart*, as it was used, requires us to find probable cause on evidence *wholly independent* of any confidential communication received. This interpretation, as pointed out in Judge Frankel's opinion below, 248 F. Supp. at 915–916, is necessarily rejected by other language in *Roviaro* and our decisions that have followed it.

■ *Roviaro* cautioned that "no fixed rule with respect to disclosure is justifiable," and that the problem presented by the claim of informer privilege "is one that calls for balancing the public interest in protecting the flow of information" against the interest of the individual that would be served by disclosure. 353 U.S. at 62, 77 S.Ct. at 628. If, as appellant suggests, disclosure were required "whenever an informer's report plays some role in the proof of probable cause * * *, there would never be anything to weigh in these cases," and "the perplexities [that] the courts have faced would have been imaginary all along." 248 F.Supp. at 915–916. It would seem therefore that if *any* rule requiring disclosure might be extracted from the language of *Roviaro*, it would be that disclosure would be required only where independent evidence was so insubstantial that in essence "the existence depends solely upon the reliability of an informer * * *." United States v. Elgisser, supra 334 F.2d at 110; see United States ex rel. Coffey v. Fay, supra 344 F.2d at 633–634; also People v. Malinsky, 15 N.Y.2d 86, 93–94, 262 N.Y.S.2d 65, 72–73, 209 N.E.2d 694, 699–700

---

4. In requesting disclosure, appellant's counsel made the following statement:
"My position is that I think that the informant's name should be made available to defense counsel at every hearing on a motion to suppress. I think that if the conduct of a lawsuit is to be the pursuit of truth, the informant's privilege must fall by the wayside, and, in essence, that is my position."

(1965). See, however, McCray v. Illinois, supra at 311–312 n. 11.[5]

■ Viewing other language found in Second Circuit cases, that disclosure is compulsory whenever the informants' communications are "essential to the establishment of probable cause * * *," United States v. Elgisser, supra 334 F.2d at 110, see United States v. Santiago, supra 327 F.2d at 575; United States v. Rosario, 327 F.2d 561, 564 (2 Cir. 1964); United States v. Robinson, supra 325 F. 2d at 393–394, in the light of the foregoing it is difficult to read "essential" as synonymous with *any quantum;* rather, "essential" must be read to mean "the essence or core or main bulk" of the evidence brought forth which would otherwise establish probable cause. The *Robinson* case, cited and relied upon so heavily by appellant, cannot be said to stand for any proposition to the contrary, for in that case the showing of probable cause for the arrest was based almost entirely upon informant information, as "the arresting officers knew nothing more than what the informant had told them". United States v. Elgisser, supra 334 F.2d at 111 (Lumbard, C. J., concurring).

■ Inasmuch as we conclude that we are not bound by any rule requiring disclosure of the informants' identities, we then reach the question whether nondisclosure was justified in light of the particular circumstances of this case. Although appellant did not set forth any particular reasons as to why the disclosure of the informants' identities would prove useful, it is generally recognized that by demanding disclosure, a defendant avails himself of the opportunity to test the existence of the informer and whether the agents ought to have regarded the information they obtained as reliable, and, of course, whether the agent might have misrepresented the information given him by the informant. In cases such as this where probable cause for arrest is at issue, rather than the guilt or innocence of the defendant, it matters little whether the informants were truthful in fact, it matters only that in the judge's view, the agents acted reasonably on the basis of all the facts at hand. See Beck v. State of Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). In view of the corroborative nature of events which the agents themselves observed on the night of arrest, we think it was proper for the agents to give some weight, sufficient for the present inquiry, to the information yielded by the four informers. This assumes, of course, that the agents' sworn statements, both as to the existence of the informants and the substance of the information received, were truthful, a factor for which there is no guarantee short of disclosure and production of the four informants for purposes of cross-examination. But, even in viewing the credibility of the agents we are mindful that outright perjury by federal agents is not a common occurrence, see, e. g., U. S. ex rel. Coffey v. Fay, supra 344 F.2d at 634, and there was still much evidence before the judge on the motion to determine their credibility, and if he doubted it he could have required the informants to be identified or even produced. Here, both agents Scott [6] and Smith took the stand, and Judge Frankel found that the "possibility" that their report might have been falsified "remained almost entirely incredible after the agents had been cross-examined." 248 F.Supp. at 917.

5. "* * * Since there was no probable cause issue in Roviaro, the quoted statement was clearly not necessary for decision. Indeed, an absolute rule of disclosure for probable cause determinations would conflict with the case-by-case approach upon which the Roviaro decision was based. Moreover, the precedent upon which this dictum was grounded furnishes only dubious support. Scher v. United States, 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151, the only decision of this Court which was cited, affirmed the trial judge's refusal to order arresting officers to reveal the source of their information."

6. Agent Scott's case report was made available to defense counsel during his examination of the agent.

Against the defendant's interest in the disclosure by the government of the identity of the informants, in order that he may explore the justification for the arrest, there is the strong public interest in encouraging the free flow of information to law enforcement officers. An informant may volunteer information to government agents for a variety of reasons, see e. g., Harney & Cross, The Informer in Law Enforcement 33–39 (1960); Gutterman, The Informer Privilege, 58 J.Crim.L. 32, 33–34 (1967), but it has been the experience of law enforcement officers that the prospective informer will usually condition his cooperation on an assurance of anonymity, fearing that if disclosure is made, physical harm or other undesirable consequences may be visited upon him or his family. By withholding the identity of the informer, the government profits in that the continued value of informants placed in strategic positions is protected, and other persons are encouraged to cooperate in the administration of justice. See 8 Wigmore, Evidence § 2374 (McNaughton rev. 1961); Gutterman, supra at 32.

Communications from informers have proved vital to the detection of criminal activity, see, e. g., the Challenge of Crime in a Free Society, A Report by the President's Commission on Law Enforcement and Administration of Justice 218 (1967); Vollmer, The Police in Modern Society (1936), and the importance of "informer's privilege" in keeping open channels of information is seldom more evident than in cases involving narcotics offenses, because detection through other means proves so difficult. Small quantities of narcotics, worth large sums of money, can be easily concealed and moved about, and as in the enforcement of vice and liquor laws, there is seldom an aggrieved victim when narcotics laws are violated, who might render information

voluntarily. E. g., 1956 Report of the Subcommittee on Narcotics of the Committee of Ways and Means of the House of Representatives, 1956 U.S.Code & Ad.News, p. 3302; Model Penal Code § 2.10, comment, p. 16 (Tent.Draft No. 9, 1959). The fear that harm may result from disclosure seems all the more real when it is recognized that the narcotics traffic is usually carried on by large organized rings who are ruthless in the protection of their interests and who deal mercilessly with those who disclose their activity.

In the present case the government made clear its position that it thought it to be in its best interest not to disclose the identity of any of the four informers who had given information, running the risk that the defendants' motion to suppress would be granted. Judge Frankel carefully considered the evidence presented and found that there was probable cause for arrest. He was further of the view that "the likelihood that defendants would have used the informants * * *, and that the strong showing of probable cause could then have been dissipated, is thin almost to the point of nonexistence." 248 F.Supp. at 917. We agree that the disclosure was unnecessary and that the motion to suppress was properly denied.

As the result of certain intimations that might be drawn from Judge Frankel's thorough and considered opinion, 248 F.Supp. at 912 n. 2,[7] we think it necessary to make one further comment regarding the inquiry as to establishing probable cause at a pretrial hearing. There is, of course, no inherent reason why the government should be required to elect not to disclose the identity of its informers, and then be required to stand on that election prior to a ruling by the court on whether or not probable cause has already been estab-

---

7. " * * * The Assistant United States Attorney argued that an 'invitation' posed excessively delicate issues of legal etiquette for the Government. He urged, in effect, that the evidence be considered, first, with the informants undisclosed, and that the question of disclosure is faced only after a finding, if one were made, that there was insufficient independent evidence of probable cause. Defense counsel, on the other hand, argued convincingly that the Government ought not to have the proverbial two bites."

lished on the evidence presented. The government ought to be permitted considerable latitude as long as the defendant is not then in jeopardy, and vague notions of unfairness, that the government should not have "two bites" off the same apple, ought not control. We think no injustice would result if, in hearings such as this, the court were first to rule on the motion to suppress when the request for disclosure is made and after all the evidence is presented, and if the court's ruling is unfavorable to the government, to allow the government to reconsider its decision not to disclose. Compare United States v. Robinson, supra (reversed and remanded for rehearing on reliability of undisclosed informer. See United States v. Robinson, 354 F.2d 109 (2 Cir. 1965)). It would seem that a decision to follow such a procedure would often be warranted, and that it could be made in each instance simply on the basis of such considerations as its effect on court economy, the avoidance of unnecessary delay in the pre-trial stage, and the acknowledged importance of the "informer's privilege" to the government. In cases such as this the government must weigh the consequences of disclosure of the informant in the light of the probability that thereby other current investigations involving the same informant may be frustrated and that the informant himself might become unavailable for future investigations.

■ Appellant's further claim that the evidence was insufficient to sustain his conviction is without merit. To give rise to the permissible inference under 21 U.S.C. §§ 173, 174, that the heroin was illegally imported and that the defendant knew it to be, it need only be shown that he had constructive possession of it. See, e. g., United States v. Ramsey, 374 F.2d 192, 195 (2 Cir. 1967); United States v. Lopez, 355 F.2d 250 (2 Cir. 1966); United States v. Jones, 308 F.2d 26, 31–33 (2 Cir. 1962). There was sufficient evidence submitted to the jury from which it could find that the appellant had "the requisite domination and control [over the narcotics] to

justify a finding of constructive possession," United States v. Lopez, supra, 355 F.2d at 252.

■ As between "Bippety Bop" Worrell and appellant Tucker, there was much undisputed evidence to suggest a conspiracy and that of the two it was Tucker who was in charge of the narcotics transaction. It was Tucker who, after giving Worrell a sum of money, sent him out to get a "sample" and make a "meet." When Worrell returned, Tucker left to rendezvous with Carswell "on business." The actual pickup was made by Worrell with Carswell's aid. The 1964 Cadillac used throughout the evening was registered in Tucker's name, and it was Tucker who in an assumed name had taken Room 211, the room in which the gatherings took place. At the time of arrest, Tucker had $2615.60 in cash on his person, with which the jury might infer that the transaction was to be consummated; Worrell had only seventeen dollars. In view of such evidence it was proper to submit the case to the jury on both the substantive and conspiracy counts. There was ample evidence to support the conviction, which is affirmed.