UNITED STATES of America,
v.
Robert L. DURKIN et al.

No. 71 Cr. 1229.

United States District Court,
S. D. New York.

Dec. 30, 1971.

OPINION

EDWARD WEINFELD, District Judge.

Four defendants, under indictment for possession and conspiracy to possess seventy-two counterfeit Federal Reserve notes, move pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure to suppress such notes as evidence on the trial on the ground that they were illegally seized in violation of the Fourth Amendment stricture against unreasonable search and seizure.

A hearing was held, at which time the following facts were adduced. Max Young was an employee of the entity which services the coin rental lockers at the Port Authority bus terminal in New York City, whose duties required him to assist patrons who experienced difficulty in opening lockers or had lost keys to their lockers, and to perform this function he had a master key. On October 19, 1971, at about 2 p. m., Young's aid was enlisted by a patron who was attempting unsuccessfully to open a locker with his key. Young, also unsuccessful in his effort to open the locker with the key that the patron had, then used his master key to open it and saw a stack of bills laying unwrapped in the locker. After he had opened the locker, Young noticed that the serial number on the patron's key did not match with the locker lock; the patron evidently had been trying to open a locker other than the one he had rented; the patron then went to the correct locker. Young, having closed the locker thus inadvertently opened, and evidently suspicious about the currency, consisting of seventy-two bills (face value $720) not wrapped or covered in any way, promptly reported his find to the Port Authority police who were stationed at the terminal. Soon Lt. Gonzales of the Port Authority police appeared at the locker, in which Young told him he "had seen a stack of bills," whereupon Gonzales asked Young to open the locker, which he did with his master key. Gonzales noted that the bills seemed "off color" and removed the currency to his office where closer ex-

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., New York City, for plaintiff; John J. Kenney, Asst. U. S. Atty., of counsel.

Howard L. Jacobs, New York City, for defendant Durkin.

Joseph Stone, New York City, for defendant Iannocone.

Gilbert Epstein, Legal Aid Society, New York City, for defendant Lapierre.

Jay Gold, New York City, for defendant Patterson.

amination revealed many of the bills contained the same serial number, and he determined they were counterfeit. He notified the Secret Service and then replaced the money in the locker, had Young lock it, and placed the locker under plainclothes surveillance. In a short time, at about 3 o'clock, Secret Service Agent Zano appeared at the locker, which was reopened, and Zano leafed through the money and put it back in the locker. At this time, the Secret Service established a surveillance about the locker, replacing the one that Gonzales had assigned.

At about 9 p. m., some six and one half hours after Gonzales first saw the money (and six hours after the Secret Service had set up its surveillance), according to the testimony of Secret Service Agent Reilly, defendants Iannocone and Patterson went to the locker; Iannocone unlocked it with a key and opened it a few inches. Patterson, who appeared to be acting as a "lookout," evidently noticed they were under observation by Reilly and his fellow agent Ott, and said something to Iannocone, who thereupon closed the locker and the two defendants started to walk away. Iannocone, while admitting he had the key to the locker, denied he had opened it, as Reilly testified.[1] In any event, the agents intercepted the two defendants, identified themselves, retrieved a key from Iannocone which fit the locker in question and arrested both. Later that evening, as a result of Iannocone's subsequent cooperation, the defendants Durkin and Lapierre were arrested, and statements were made by various defendants tending to inculpate themselves, as well as others.

The coin lockers are rented on a twenty-four hour basis; it is undisputed that the rental time on the locker had not expired during the occurrence of the events recited above; further, it is not disputed that no effort was made by the government agents to obtain a search warrant, nor is there any indication that there was any regulation barring the use of lockers for storage of currency, or that any notice was posted or given to renters except to the effect that items left in the lockers after the expiration of the twenty-four hour rental period were subject to removal.

An initial question is whether the Fourth Amendment protection against unreasonable searches and seizures extends in favor of the renter of a public locker. The issue is whether such a locker may be deemed "an area where, like a home . . . a person has a constitutionally protected reasonable expectation of privacy . . . ."[2] The thrust of the Katz opinion was directed toward the expectation of privacy "even in an area accessible to the public."[3] There can be no doubt that the renter of a locker at public terminals or similar public places justifiably expects that it is for his private use, to place therein what he will, free from prying eyes, and that it and its contents are inviolate except as they may be constitutionally searched. The fact that in the event the paid rental period expires without renewal, thereby subjecting the contents to removal, does not detract from the renter's right to protection against unreasonable searches and seizures during the rental period. Those courts which have considered the issue are in accord that the Fourth Amendment protection against unreasonable searches and seizures extends to protect the renter of a public locker to the

1. The testimony of Max Young tends to support Iannocone's version. Young said that when a patron uses the key to open a locker, he cannot relock it and retrieve the key without inserting another coin. Reilly did not testify he saw Iannocone insert another coin and it is not disputed that the latter still had the key in his possession when he was subsequently taken into custody.

2. Katz v. United States, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).

3. Id. at 351, 88 S.Ct. at 511.

same extent that he is protected in the privacy of his home.[4]

■■ We next consider the defendants' standing to challenge the search and seizure of the counterfeit bills. The issue must be considered in the context of two separate charges in which each defendant is named—the substantive crime of illegal possession of counterfeit Federal Reserve notes, and conspiracy so to possess. There is no evidence in the case as to who rented the locker or who placed the currency therein. As already noted, Iannocone was arrested near the locker, with the defendant Patterson acting as his "lookout." However, Iannocone denied he had opened the locker and Patterson simply said he had accompanied Iannocone to the terminal. The other two defendants were nowhere in the vicinity of the locker and no direct act or conduct by either of them with respect to the locker has been presented. Accordingly, the government, in the absence of a claim by any defendant of a possessory interest, urges that none has standing to assert a constitutional claim under the Fourth Amendment, suggesting that perhaps the locker was rented by a person other than one of these defendants. However, the government has accused each in the substantive count, and accordingly an essential, if not the prime, element of the offense is the illegal possession of the counterfeit bills by a defendant, or his aiding and abetting another in such illegal possession. And, of course, possession need not be actual, but may be constructive, through a "working relationship" with another who has actual possession.[5] In these circumstances, the government is precluded from denying that each defendant so charged with illegal possession does not have the requisite interest to challenge the admission in evidence of items allegedly obtained as a result of an alleged unlawful search and seizure.[6]

However, a different situation exists as to the conspiracy count, which charges that it was part of the conspiracy that defendants would unlawfully "keep in their possession and conceal and cause others to keep in their possession and conceal" counterfeit Federal Reserve notes. No movant has asserted any possessory interest in the notes. Iannocone testified that he acquired the key to the locker at about 6 p. m. on the day of the events here described from "Bob," an acquaintance, who asked him as a favor to obtain the contents of the locker. Patterson, as already noted, testified his sole role was to accompany Iannocone to the bus terminal. Durkin and Lapierre, the other two defendants, did not testify at the suppression hearing. Each defendant was free to testify and to assert a possessory interest in the contraband without the risk that his statements could be used against him at the trial.[7] In the absence of any claim of a possessory interest in the locker or its contents, the defendants, as alleged co-conspirators, have no standing to challenge the search. The fact that the rights of a conspirator "to the Grand Jury unknown" may have been violated

4. *See, e. g.,* United States v. Small, 297 F.Supp. 582 (D.Mass.1969); People v. McGrew, 1 Cal.3d 404, 82 Cal.Rptr. 473, 462 P.2d 1 (1969), cert. denied, 398 U.S. 909, 90 S.Ct. 1689, 26 L.Ed.2d 67 (1970); People v. Baker, 12 Cal.App.3d 826, 96 Cal.Rptr. 760 (1970).

5. *See* United States v. Gonzalez, 442 F.2d 698, 702–703 (2d Cir. 1971); United States v. Baratta, 397 F.2d 215, 224 (2d Cir.), cert. denied, 393 U.S. 939, 89 S.Ct. 293, 21 L.Ed.2d 276 (1968); United States v. Beigel, 370 F.2d 751, 756 (2d Cir.), cert. denied, 387 U.S. 930, 87 S.Ct. 2049, 18 L.Ed.2d 989

(1967); United States v. Lopez, 355 F.2d 250, 252 (2d Cir.), cert. denied, 384 U.S. 1013, 86 S.Ct. 1979, 16 L.Ed.2d 1031 (1966).

6. *See* Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *See also* Simmons v. United States, 390 U.S. 377, 390, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); United States v. Price, 447 F.2d 23, 29 (2d Cir. 1971); United States v. Cobb, 432 F.2d 716, 721–722 (4th Cir. 1970).

7. Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

gives these defendants no standing to assert vicariously the unknown conspirator's rights.[8]

 Since the defendants have standing under the substantive count, we next consider whether the search and seizure was valid. The sequence of events indicates that when Young inadvertently opened the locker for a patron and it turned out to be the wrong one, Young was acting in a private capacity —in fact carrying out his duties of aiding persons who were renters. His action, what he discovered, what use he made of his discovery, is beyond constitutional challenge. Whether inadvertent or by design, his opening of the locker does not come within the ban of the Fourth Amendment as long as he was not acting upon the instigation of or in collusion with governmental authorities.[9] The purpose of the exclusionary rule is to deter unconstitutional conduct by law enforcement officers.[10]

 Young, when he came upon the currency, had had no contact with any official. He had not been acting as an agent or at the direction of any official in the enforcement of law, but solely as an employee of the entity that operated and serviced the locker. His action in notifying the police was his own; he acted on his own initiative. Had Young removed the money and brought it to the police for them to inspect, no constitutional issue would have arisen. Instead, acting with caution and not in an unreasonable manner, he left the money in its place and notified Gonzales, who examined it while still in the locker and, it appearing spurious, then removed it for closer inspection, and when satisfied it was counterfeit, returned it to the locker and then notified the Secret Service. The fact that Gonzales went to the locker at Young's instance and asked him to open it, is of no constitutional significance, since Young intended to reveal what he had found to the police and to cause such an inspection to be made.[11] Gonzales then knew the crime of counterfeiting had been committed and had probable cause to believe that a person or persons were engaged in the commission of the crime of unlawful possession of counterfeit notes, and would have been justified in seizing the illicit bills. But he did not; instead, after his inspection of the bills, he placed a surveillance about the locker and awaited the arrival of the Secret Service agents who were to take over. However reasonable Gonzales' actions may have been up to this point, based upon a balancing of the need to search against the invasion which the search entailed,[12] it does not end inquiry—there still remains the question whether the eventual seizure of its contents satisfied the Fourth Amendment requirements as to warrant procedure. From that point on, about 3:00 p. m., the investigating officers, having probable cause to believe a crime had been committed, were in a position to apply for a search warrant. There were no exigent circumstances to excuse the failure to apply for one. There was

---

8. Alderman v. United States, 394 U.S. 165, 171–172, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) ; United States v. Price, 447 F.2d 23, 30 (2d Cir. 1971) ; United States ex rel. Cardaio v. Casscles, 446 F.2d 632, 635 (2d Cir. 1971).

9. Burdeau v. McDowell, 256 U.S. 465, 475–476, 41 S.Ct. 574, 65 L.Ed. 1048 (1921) ; Barnes v. United States, 373 F.2d 517, 518 (5th Cir. 1967) ; United States v. Goldberg, 330 F.2d 30, 35 (3d Cir.), cert. denied, 377 U.S. 953, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964) ; United States v. Masterson, 251 F.Supp. 937, 939–940 (S.D.N.Y.), aff'd without opinion, Docket No. 30466, (2d Cir. May 16, 1966), cert. denied, 385 U.S. 833, 87 S.Ct. 72, 17 L.Ed.2d 67 (1966).

10. Coolidge v. New Hampshire, 403 U.S. 443, 487–488, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) ; United States v. Schipani, 435 F.2d 26 (2d Cir. 1970).

11. Cf. United States v. Hodges, 448 F.2d 1309, 1312 (6th Cir. 1971).

12. Cf. Terry v. Ohio, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), citing Camara v. Municipal Court, 387 U.S. 523, 534–537, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

no risk that the renter of the locker or any other person could remove or destroy its contents pending an application for the warrant. Apart from the fact that for six hours, prior to the arrest of Iannocone and Patterson at 9 p. m., the locker had been under constant surveillance, the investigating officers, upon making the arrest, had obtained from Iannocone possession of the key to the locker. Its opening and the seizure of its contents at that point cannot be justified as a search incident to a lawful arrest.[13] There was no difficulty in applying for a warrant; at least, there has been no showing that such was the case. Proximity of the Port Authority to this courthouse, where five magistrates are regularly on duty and available, suggests that a proper and timely application could readily have been made. It should be observed that:

> "We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. . . . We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative." [14]

The motion to suppress the evidence with respect to the contents of the locker is granted as to the substantive count, but denied as to the conspiracy count.

Each defendant also moves to suppress statements made upon their respective arrests upon allegations they were not given the *Miranda* warning.[15] After listening to the testimony, and based upon the demeanor of the witnesses, the Court is satisfied that each defendant was properly advised of his constitutional rights, and the motion to suppress such statements is denied.

█ The motion for a severance and separate trial is granted to the extent of ordering a severance of the indictment as against the defendant Iannocone, who, it is alleged, made statements inculpating other defendants, the purported use of which would raise substantial questions under *Bruton*.[16]

---

13. *See* Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

14. McDonald v. United States, 335 U.S. 451, 455–456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948). *See also* Coolidge v. New Hampshire, 403 U.S. 443, 453–483, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Yale v. Louisiana, 399 U.S. 30, 34–35, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948); Johnson v. United States, 333 U.S. 10, 16, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

15. Miranda v. United States, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

16. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).